IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DONALD DiGERONIMO, | Case No. 1:22-cv-00773 |
| Plaintiff, | |
| -vs- | JUDGE DAVID A. RUIZ |
| UNUM LIFE INS. CO. OF AMERICA, *et al*., | **Memorandum Opinion and Order** |
| Defendants. | |

Now pending before he Court is Plaintiff Donald DiGeronimo's Complaint challenging the denial of long-term disability benefits under two separate plans. (R. 1). Although Plaintiff concedes that one plan, Policy #607289 is an ERISA-governed plan, he maintains that the other plan, Policy #7259273 (also referred to as Provident Policy), is not governed by ERISA. *Id*. at ¶3. According to the parties' Report of Planning Meeting, "Defendant's Position is that both Plans are ERISA and therefore no discovery is appropriate. Plaintiff's position is that one Plan is under ERISA, therefore Discovery is openly permitted for the Non-ERISA Plan." (R. 12, PageID# 122). During the Case Management Conference, the parties agreed that a threshold issue exists as to whether both plans at

issue are governed by ERISA, and requested that this issue be decided by the Court on cross-motions. (R. 13).[1]

The parties have filed their respective cross-motions on the issue of whether Policy #7259273 is governed by ERISA (R. 15 & 17), as well as their respective opposition briefs. (R. 19 & 20).

For the reasons stated below, the Court finds ERISA governs Policy #7259273.

### I. Facts Relevant to Policy #7259273

Plaintiff was employed by Independence Excavating, Inc. ("Independence") for nineteen years, eventually becoming Vice president of Demolition, when he applied for Long-Term Disability benefits in June of 2021. (R. 17-3, PageID# 4425; Donald DiGeronimo Aff., Exh. 5 at ¶¶1-2). Previously, in 2004, Joseph Crea, as an agent for Benefits Resource Group, personally negotiated for and provided a Group Long-Term Disability Policy to Independence, and states that he also advised Independence's senior management "to consider having *supplemental* individual policies" in addition to the group plan. (R. 17-5, PageID# 4429; Joseph Crea Aff., Exh. 7 at ¶¶3-4).

Plaintiff states that in 2004, he became aware that Independence was in the process of setting up a Long-Term Disability policy for its employees, and Plaintiff elected to participate in that coverage. (R. 17-3, PageID# 4425, ¶3). Plaintiff maintains that his father, Robert DiGeronimo who was Director of Marketing at Independence, advised Plaintiff should consider purchasing his own personal Long-Term Disability policy. *Id*. at ¶4. Plaintiff asserts that Crea told him he could

---

[1] Neither party indicated that any discovery was necessary in order to decide this threshold issue. Thus, the Court decides the issue based only on the evidence presented for the Court's consideration.

purchase a personal Long-Term Disability policy that would provide additional disability payment coverage, which had tax advantages since it would be his own personal policy. *Id*. at ¶5.

Plaintiff was one of several executives who enrolled in the individual Long-Term Disability policy when he signed his "his individual application on June 30, 2004 (Policy #7259273)." (R. 17-5, PageID# 4429, ¶¶7- 8).

Separately "[o]n August 1, 2004, Independence Excavating, Inc. executed and approved its group Long-Term Disability policy for its employees, which was negotiated separately from any individual Long-Term Disability Policies[.]" (R. 17-5, PageID# 4429, ¶9).

According to Crea, it is his standard practice to provide a summary of benefits the year after benefits were enacted, and he engaged in "an Insurance Review in November of 2005, outlining both the group Long-Term Disability benefits coverage and reiterating the benefits of the executive maintaining individual Long-Term Disability policies." (R. 17-5, PageID# 4430, ¶10). Crea recommended that Independence "pay the premiums on behalf of its Executive members who consented to the individual Long-Term Disability policies as a 162-executive bonus, and thereafter issue 1099s to the individuals so that the policy could still provide extra coverage and tax advantages for the individual holding the individual Long-Term Disability policy," which he states is a "standard practice in the industry/business of issuing disability insurance policies for individuals with a separate individual Long-Term Disability policy." *Id*. at ¶¶11-12. Plaintiff attests that he received 1099s from his employer for his personal Long-Term Disability policy premiums. (R. 17-3, PageID# 4426, ¶10).

Previously, Plaintiff had applied for income protection insurance coverage with Unum Provident, but was denied on August 25, 2003, due to information obtained from his medical

3

providers. (R. 15-3, PageID# 4327). He was told the insurer would "reconsider this decision in two years subject to underwriting." *Id*. Internal emails of the insurer indicate that, after some discussion, it was decided that they would "offer benefits under the GSl offer for all eligible executives (Donald M. in this case) for Independence Excavating regardless of past underwriting decisions." (R. 15-2, PageID# 4321).

## II. LEGAL STANDARD

"The existence of an ERISA plan is a question of fact, to be answered in light of all the surrounding circumstances and facts from the point of view of a reasonable person." *Thompson v. Am. Home Assur. Co.*, 95 F.3d 429, 434 (6th Cir. 1996). The Sixth Circuit Court of Appeals uses a three-part test for determining whether a plan is covered by ERISA.

> First, the court must apply the so-called "safe harbor" regulations established by the Department of Labor to determine whether the program was exempt from ERISA. Second, the court must look to see if there was a "plan" by inquiring whether "from the surrounding circumstances a reasonable person could ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for receiving benefits." Finally, the court must ask whether the employer "established or maintained" the plan with the intent of providing benefits to its employees.

*Thompson*, 95 F.3d at 434–35 (internal citations omitted); *accord Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 748 Fed. App'x 12, 19 (6th Cir. 2018).

At the first step, the "safe harbor" provisions established by the Department of Labor state that "the terms 'employee welfare benefit plan' and 'welfare plan' shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which

> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation the program is completely voluntary for employees or members;

4

    (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

    (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1. "A policy will be exempted under ERISA **only if all four** of the 'safe harbor' criteria are satisfied." *Thompson*, 95 F.3d at 435 (emphasis added).

III. ANALYSIS

**A. "Safe Harbor" Criteria**

    **1. Employer Contribution**

    The first requirement of the "safe harbor" provision is that the employer, here Independence, made no contributions to the policy. Defendants assert that Plaintiff's employer paid the premiums for Plaintiff's coverage, rendering the "safe harbor" unavailable. (R. 15, PageID# 4246; R. 19, PageID# 4435).  Plaintiff acknowledges that premiums for the Provident Policy would initially be paid by Independence, and Independence would, in turn, issue a 1099 form to Plaintiff as a 162 Executive Bonus option for his personal tax benefit. (R. 17, PageID# 4332-4333).

    Because there is no dispute that Independence paid Plaintiff's premiums, at least initially, the question then becomes whether Plaintiff has presented evidence showing that the contributions made by Independence were illusory. Plaintiff asserts that  he was issued 1099s for the premiums paid by his employer. Thus, he asserts that "[a]uthority holds that as long as the premiums, despite initially being paid by the employer, are ultimately apart of the employee's taxable gross income, it follows that the employee paid the premiums." (R. 17, PageID# 4333, *citing B-T Dissolution, Inc. v.*

5

*Provident Life & Acc. Ins. Co.*, 175 F. Supp. 2d 978, 982-87 (S.D. Ohio 2001); *Clark v. Unum Grp.*, No., 2022 WL 2355457, at *3 (D.S.D. June 30, 2022); 26 U.S.C. § 104(a)(3); 26 C.F.R. § 1.104-1(d)). Plaintiff takes the position that "Independence made no contributions to the Policy, therefore the first requirement of the safe harbor provision is satisfied." *Id*.

The code and regulations cited by Plaintiff are inapposite. The code provision cited merely states that "gross income" for tax purposes does not include benefits paid by either accident or health insurance "for personal injuries or sickness…." 26 U.S.C. § 104(a)(3). The regulation cited clarifies that if "an individual purchases a policy accident or health insurance out of his own funds, amounts received thereunder for personal injuries or sickness are excludable from his gross income under section 104(a)(3)." Both of these provisions address the taxability of *benefits* and do not shed light on the impact of an employer's issuance of a 1099 form for the payment of insurance premiums on the applicability of ERISA's "safe harbor."

The two decisions cited by Plaintiff are not binding on this Court, and further do not definitively answer the issue before the Court. In *BT-Dissolution, Inc.*, the Southern Ohio District Court found that although the employer paid the premiums, "the evidence also reflects that the *full amount* of the premiums, at least in 1994, was included on Matthews' W–2 forms as gross income. As a practical matter, then, the Court concludes that Matthews, rather than B–T (the employer), actually paid the premiums." 175 F. Supp.2d at 983 (emphasis added). Here, conversely, the issuance of 1099 forms is significantly more ambiguous as to whether Plaintiff paid the premium compared to the unambiguous inclusion of the premiums on an employee's W2 as income. The same discrepancies exist in *Clark*, where the court found that the employee-plaintiff paid all the

6

premiums with taxable income and where the defendant's own billing system showed there were "no employer contributions to Clark's plan." 2022 WL 2355457 at *3.

Moreover, even if the Court were to extend the above decisions and assume, for the sake of argument, that the issuance of 1099s by Independence meant that Plaintiff paid premiums in the amount listed on the 1099 form from taxable income, Plaintiff has *not* presented or pointed to evidence of record demonstrating that he paid the *full amount* of the applicable policy's premiums. Plaintiff's affidavit, which states that "I did receive 1099s from Independence Excavating, Inc., for my personal Long-Term Disability policy premiums, and said 1099s were counted in my IRS tax filings" does not definitively establish that his employer made zero contributions. (R. 17-3, PageID# 4426, ¶10). In addition, although Plaintiff asserts that the operative policy began in 2004, Plaintiff has submitted only one 1099 form for the tax year 2019, which shows nonemployee compensation in the amount of $1,365.48. (R. 17-4, PageID# 4428). Again, this fails to establish that Plaintiff's employer paid no portion of Plaintiff's premiums.[2]

---

[2] Furthermore, whether Plaintiff paid his own premiums is arguably only part of the equation. The evidence presented does not establish that 1099 forms for the full amount of premium payments were issued to *all* executives who were enrolled in a policy like Plaintiff. At least one district court in this Circuit has explicitly stated that "[s]plitting apart the plan—by finding the safe harbor exception applies to [the plaintiff], who reimbursed his premium, but not to the majority of employees in the plan, whose employer paid their premiums—would create an anomaly where the same plan would fall under discrete regimes. Such disparate 'coverage is hardly consistent with [ERISA's] statutory goal of "uniform national treatment of pension benefits."'" *Helfman v. GE Grp. Life Assur. Co.*, 2008 WL 3318741 (E.D. Mich. Aug. 8, 2008) (quoting *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2004)). In upholding the district court's determination, the Sixth Circuit Court of Appeals held that "if an employer contributes to any employee's payment of premiums, ERISA must apply to the entirety of the particular insurance program, regardless of whether one or more employees pays his own premiums in full." *Helfman v. GE Grp. Life Assur. Co.*, 573 F.3d 383, 391 (6th Cir. 2009).

7

Finally, even if the Court were to presume that Plaintiff paid the premiums in their entirety since the time he started receiving 1099 forms, the evidence shows that Policy #7259273 took effect on September 1, 2004. (R. 17-1, PageID# 4338). According to insurance agent Crea's affidavit, submitted by Plaintiff in support of his motion, it was "standard practice to provide a summary of benefits the year after benefits were enacted," and Crea performed such a review in November of 2005—over a year after the policy took effect. (R. 17-5, PageID# 4430, ¶10). At that November 2005 review, Crea "recommended that Independence … pay the premiums on behalf of its Executive members who consented to the individual Long-Term Disability policies as a 162-executive bonus, and thereafter issue 1099s to the individuals so that the policy could still provide extra coverage and tax advantages for the individual holding the individual Long-Term Disability policy[.]" *Id*. at ¶11. Thus, Defendants convincingly assert that, at the time Policy #7259273 took effect in September of 2004—and for approximately fourteen ensuing months—Plaintiff's employer paid the premiums and did not issue any 1099 forms in connection with those premiums. (R. 19, PageID# 4435).

In *Alexander v. Provident Life & Acc. Ins. Co.*, 663 F. Supp. 2d 627 (E.D. Tenn. 2009), a district court was confronted with a scenario where an employee continued a policy after leaving employment and took over payment premiums from his employer. Other than the plaintiff taking over payment of the premiums, his disability policy remained in force without change. *Id*. at 636. Relying on Sixth Circuit precedent, that court found that "[a]s a matter of law, Plaintiff's individual payment of premiums after leaving Associates does not convert the policy to a new, individual policy outside the governance of ERISA." *Id*. (*citing Massachusetts Cas. Ins. Co. v. Reynolds*, 113 F.3d 1450, 1453 (6th Cir. 1997) (finding that where a policy remained in force without change

8

other than the individual's payment of premiums, ERISA continued to govern); *Vincent v. Unum Provident Corp.*, 2005 WL 1074370 at *2–3 (E.D. Tenn. May 5, 2005) (determining ERISA applied where plaintiff continued coverage he acquired by virtue of his employment, continued to receive a discounted rate, and the only change was he took over payments)). Here, the Court concludes that, at a minimum, Plaintiff's employer contributed to the payment of premiums for the first fourteen months of the policy's existence. For the safe harbor exemption to apply, it requires that an employer make **no contributions**. Plaintiff cites no authority suggesting the contribution must be ongoing or rise to any specific threshold or percentage of the overall payment of premiums.

Because all four of the criteria must be satisfied for the "safe harbor" exemption to apply, the Court need not address the remaining criteria.

### IV. Conclusion

Because a policy will be exempted under ERISA only if all four of the "safe harbor" criteria are satisfied, *Thompson*, 95 F.3d at 435, the Court concludes that Plaintiff's Policy #7259273 is governed by ERISA. Therefore, Defendants' Motion for an Order that ERISA applies to Policy #7259273 is hereby GRANTED. (R. 15). Conversely, Plaintiff's Cross-Motion on the issue is DENIED. (R. 17).

IT IS SO ORDERED.

Date: September 26, 2023

*s/ David A. Ruiz*
DAVID A. RUIZ
UNITED STATES DISTRICT JUDGE

9