**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| DONALD DIGERONIMO,<br><br>Plaintiff,<br><br>-vs-<br><br>UNUM LIFE INS. CO. OF AMERICA, *et al.*,<br><br>Defendants. | Case No. 1:22-cv-00773<br><br>JUDGE DAVID A. RUIZ<br><br>**Memorandum Opinion and Order** |

Plaintiff Donald DiGeronimo brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") to recover benefits from Defendant's long-term disability benefits plan (the "Plan") under 29 U.S.C. § 1132(a)(1)(B), as well as a breach of contract claim. (R. 1).[1] This matter is before the Court on cross-motions for Judgment on the Administrative Record, with each side filing Opposition briefs. (R. 31, 32, 34, 35).

## I. Factual and Procedural Background[2]

Plaintiff was employed by Independence Excavating, Inc. ("Independence") for nineteen years, eventually becoming vice-president of demolition, and applied for Long-Term Disability

[1] Count Two for breach of contract asserts Providence denied his claim for Long-Term disability benefits under Policy #7259273. (R. 1, PageID# 4). By way of a previous Order, the Court has determined that ERISA applies to Policy #7259273, and thus to Count Two. (R. 21, PageID# 4456).
[2] The Court's recitation of the evidence is not intended to be exhaustive.

(LTD) benefits with Unum on July 10, 2020. (R. 17-3, PageID# 4425; Donald DiGeronimo Aff., Exh. 5 at ¶¶1-2; R. 14-1, PageID# 167).

**A. The Policies**

Unum's Long Perm Disability Plan for Independence Excavating, policy #607289, states in material part as follows:

> **Owners, Officers, Directors, Vice Presidents and Senior Managers**
> You are disabled when Unum determines that due to your sickness or injury:
>
> 1. You are unable to perform the material and substantial duties of your regular occupation and are not working in your regular occupation or any other occupation
>
> or,
>
> 2. You are unable to perform one or more of the material and substantial duties of your regular occupation, and you have a 20% or more loss in your indexed monthly earnings while working in your regular occupation or in any occupation.
>
> You must be under the regular care of a physician in order to be considered disabled.
>
> ***
>
> **MATERIAL AND SUBSTANTIAL DUTIES** means duties that:
>
> - are normally required for the performance of your regular occupation; and
> - cannot be reasonably omitted or modified.
>
> ***
>
> **REGULAR OCCUPATION** means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

(R. 14-10, PageID# 4148, 4167, 4169).

The Provident Life and Accident Insurance Company's Disability Income Policy, policy #7259273, states in material part as follows:

> **Total Disability** or **Totally Disabled** means that because of Injuries or Sickness:
>
> 1. You are unable to perform the material and substantial duties of Your Occupation; and
> 2. You are not engaged in any other occupation; and
> 3. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.
>
> After the end of the Your Occupation Period, Total Disability also means:
>
> 4. You are unable to perform the material and substantial duties of Any Occupation.
>
> ***
>
> **Your Occupation** means the occupation or occupations, as performed in the national economy, rather than as performed for a specific employer or in a specific location, in which You are regularly engaged at the time You become Disabled.

(R. 14-9, PageID# 4114).

## B. Plaintiff's Medical History and the Procedural History of the Claim

In July 1999, at age eighteen, Plaintiff began suffering from one or two seizures per day. (R. 14-5, PageID# 2555). He was diagnosed with right temporal lobe epilepsy. *Id*. A September 2000 right temporal lobectomy resolved the seizures for two years. *Id*. at PageID# 2578, 2590.

In September of 2004, Plaintiff began treatment with Nancy Foldvary-Schaefer, D.O., for epilepsy. (R. 14-1, PageID# 172–174). He underwent a right temporal lobe resection two years earlier in March of 2002.

In March of 2006, Plaintiff underwent a resection surgery after the seizures returned. (R. 14-5, PageID# 2608, 3494, R. 14-1, PageID# 172)).

Plaintiff remained seizure free for a number of years after the 2006 surgery, and even discontinued his seizure medication (Lamictal) in 2008. (R. 14-4, PageID# 1897, 1900, 3037, 3319, 3379).

In June of 2015, Plaintiff reported "4-5 seizure-like episodes in the last six months." (R. 14-4, PageID# 1897).

In February of 2016, it was noted Plaintiff underwent annual MRIs and had no recurrence of tumor (R. 14-6, PageID# 3379); his last seizure was over two months earlier in his sleep (*id.*); and he had no focal weaknesses or sensory loss. (R. 14-6, PageID# 3381).

On September 22, 2016, Plaintiff was seen by Glen Stevens, D.O. His treatment notes state as follow:

> He is here for early follow up due to new symptoms. For last few months has been having the an [sic] occasional sensation that is similar but not same as what he used to get before his seizures. It happens on awaking from deep sleep and lasts only 5-10 seconds. He has had 4-5 episodes in the last six months. He describes it almost like the sensation of getting out of bed too fast but happens while still lying done. Since his last visit, he saw Dr. Foldvary and plan is to control the triggers and she also offered PSG/EEG. Routine EEG was unremarkable. He had a few more similar episodes about a month back where he woke up from sleep and had an uneasy feeling in his head. Wife witnessed an episode where he was pale and had to lay down but intact consciousness throughout. He went to the ER for GP and had an unremarkable work up.

(R. 14-6, PageID# 3319). His neurological examination was unremarkable. (R. 14-6, PageID# 3320). An MRI the same day revealed no change from MRIs performed earlier in the year and the prior year. *Id.* at PageID# 3336.

On February 13, 2017, Plaintiff reported having a seizure 1–2 times per month, usually upon waking in the morning or waking from a deep sleep in the middle of the night. (R. 14-5, PageID# 2873). Although Dr. Foldvary-Schaefer reiterated her request that Plaintiff undergo a sleep study

and EEG, Plaintiff stated that he was "not interested in any tests at [that] time because he [did] not want to take any medication." *Id*.

On April 10, 2017, an MRI of the brain showed no change in appearance. (R. 14-6, PageID# 3297).

A June 29, 2017 notation from Christopher Florio, RN indicates that Plaintiff reported night seizures 2–3 times a week. He was not on any medication to control seizures at the time. (R. 14-5, PageID# 2866).

In August of 2017, Plaintiff went to the emergency department for a panic attack. (R. 14-5, PageID# 2858). He underwent an EEG that month that confirmed an epilepsy-related seizure ("1 episode captured on 8/12 ~1800 which was his typical complex partial seizure with a 'panic' type feeling as an aura--> loss of awareness--> lip smacking. Event lasted <1 minutes without a clear postictal phase." (R. 14-3, PageID# 1771). He was started on a progressing regimen of Lamictal (i.e. Lamotrigine), culminating in a 100mg tablet of Lamictal both morning and evening. (R. 14-6, PageID# 3216).

On November 17, 2017, Plaintiff sent a note to Dr. Foldvary Schaefer indicating he had a nocturnal seizure and was inquiring whether the body becomes accustomed to the medications. (R. 14-6, PageID# 3021). He stated: "I feel great during the day with no issues." *Id*. The next month he was encouraged to see a psychologist for his anxiety. (R. 14-6, PageID# 2983).

While working at Independence in 2017 and 2018, Plaintiff's night seizures persisted, and he continued to cite stress and anxiety as triggers; neurological examinations remained unremarkable. (R. 14-3, PageID# 1771-72; 1774, 1899-1900, 1940-41, 2004-2005, 2039, 2991, 3008, 3032-34).

On March 19, 2018, he was seen by Firdaws Laryea, PA-C, and declined to try psychotropic medication. (R. 14-4, PageID# 2007). The plan was to increase his Lamictal dose at bedtime to 125mg. *Id*.

On April 20, 2018, Plaintiff was seen by psychologist Catherine Stenroos, Ph.D., who diagnosed anxiety disorder NOS and substance abuse disorder; she referred Plaintiff to a chemical dependency specialist. (R. 14-4, PageID# 1994). Plaintiff reported a rough two years at work, including family conflict at the business. *Id*. at PageID# 1992. He used alcohol and cannabis to reduce anxiety. *Id*.

By July 2018, Plaintiff's wife reported that Plaintiff was having 1–3 seizures per night. (R. 14-5, PageID# 2849).

Throughout the next two years, while continuing to work full-time at Independence, he treated his seizures with 300mg of Lamictal—one 100mg in the morning and 200mg in the evening. (R. 14-3, PageID# 1738, 1763, 1770, 1775).

Medication notes in February of 2019 and March of 2019 indicated Plaintiff was not taking Lamictal as prescribed. (R. 14-3, PageID# 1770).

In January 2020, Plaintiff ruptured his Achilles tendon while playing basketball, resulting in surgery the next day. (R. 14-3, PageID# 1724). During a related physical therapy visit in February 2020, the therapist described Plaintiff's prior level of function as "independent without limitations," Plaintiff's goal was to return to working out and sports, and the therapist assessed a good prognosis. (R. 14-3, PageID# 1723-1724).

On April 23, 2020, during a virtual visit with nurse Kim Merner, RN-MSN, of Dr. Foldvary-Schaefer's office, Plaintiff stated that he did not want to make any changes to his seizure

medication (300mg of Lamictal), wanting to await the results of an upcoming MRI and visit with his neuro-oncologist Glen H.J. Stevens, D.O. (R. 14-3, PageID# 1708). His memory was good and he was driving, and reported seizures once or twice monthly. *Id*. at PageID# 1707.

On April 29, 2020, an MRI of Plaintiff's brain showed no significant changes compared to earlier MRIs taken in 2019, 2018 and 2011. (R. 14-2, PageID# 1700-1701). The next day, during a virtual visit, Dr. Stevens reviewed the MRI, as well as past images with Plaintiff, noting that Plaintiff's brain MRI remained stable with no clear change. (R. 14-3, PageID# 1689). Plaintiff reported his mood was stable, and work and business were "doing OK" during the Covid crisis. *Id*.

Plaintiff submitted a claim for disability benefits on July 28, 2020, alleging a disability onset date of June 5, 2020. (R. 14-1, PageID# Id. at 164-67). With respect to his current activities, Plaintiff reported that he was involved in "various management work" and "business development." (R. 14-1, PageID# 165). He indicated that he was still able to perform "business development, maintaining some clients" but was unable to perform executive management. *Id*. Plaintiff checked a box indicating he had returned to work. *Id*.

In his claim, Plaintiff alleged that he had worked as a Vice President of Construction and was not currently self-employed, and not working for any other employer. (R. 14-1, PageID# 168). He indicated he had problems "staying awake," and lacked the alertness and "sharp cognitive function" necessary for his work. (R. 14-1, PageID# 169).

On July 28, 2020, Plaintiff was seen by nurse Kim Merner, RN, MSN—not Dr. Foldvary-Schaefer—in a virtual visit to discuss disability. (R. 14-2, PageID# 796). He was noted as having last seen Dr. Foldvary-Schaeffer three months earlier on April 23, 2020. *Id*. He had no physical limitations and exercised daily. *Id*. Plaintiff reported his last seizure was five weeks earlier related

to an "intense meeting." *Id*. It was noted that a recent MRI showed no change. *Id*. He reported frequent auras, almost daily. *Id*. Merner's assessment noted Plaintiff "continue[d] to have infrequent seizures and frequent auras," "no physical limitations," and Plaintiff reported that "[s]tress and his former job level were triggers," but he had quit his job and applied for disability. (R. 14-2, PageID# 798).

On the same day, July 28, 2020, Dr. Foldvary-Shaefer completed a Unum disability form. (R. 14-1, PageID# 174). She opined that Plaintiff should avoid "use of heavy equipment/machinery, avoid heights/climbing, [and] avoid sharp moving objects/equipment" due to "seizures with confusion, altered mental state/cognition, stress, especially as his job is main trigger for seizure occurrences." (R. 14-1, PageID# 173-174). The restrictions were indicated to have begun in 2004 and extended to the "present [year 2020], ongoing." *Id*. at PageID# 173.[3] The diagnostic findings supporting the assessed restrictions were identified as "seizures with confusion, altered mental state/cognition." (R. 14-1, PageID# 174).

On October 14, 2020, Dr. Foldvary-Schaefer wrote a letter stating as follows:

> Mr. Digeronimo primarily experiences nocturnal seizures which disrupt his sleep pattern. He has difficulty falling back to sleep after seizures and is therefore sleep deprived in the morning. Sleep deprivation results in impaired cognitive functioning and increased stress through out the next day. Known aura/seizure triggers for Mr. Digeronima [sic] are sleep deprivation and job duty stress. The combination of nocturnal seizures, sleep deprivation, cognitive impairment and increased job stress are the findings that support his inability to fulfill job responsibilities.

(R. 14-2, PageID# 785).

---

[3] According to the doctor's own opinion, these restrictions/limitations were not new and had been present since 2004—the past sixteen years of Plaintiff's tenure with his employer.

On October 22, 2020, Defendant's medical consultant, Joseph A. Antaki, M.D., contacted Dr. Foldvary-Schaefer's office and spoke to a nurse, who clarified that Plaintiff has nocturnal seizures, which do not require a driving restriction; the nocturnal seizures result in impaired cognition the following day; and Plaintiff was last seen on July 28, 2020, with no changes in treatment at that time. (R. 14-2, PageID# 804-805). Dr. Antaki noted that Plaintiff's most recent brain MRI was considered "stable" without an indication for further tumor treatment, Plaintiff's KPS (Karnofsky Performance Status-used in assessments of those with cancer) scale was "90," which was "consistent with an ability to carry on normal activity and work." (R. 14-2, PageID# 808).

On October 28, 2020, outside physician consultant and board certified neurologist Michael Chilungu, M.D., reviewed Plaintiff's file and came to the following conclusion:

> Based on the available information, clinical evidence does not support functional neurologic impairment during the period under review.
>
> The claimant has complained of symptoms of recurrent, primarily nocturnal seizures, as a cause of occupational impairment. The claimant's medical providers, Neurologist Dr. Foldvary Shaefer [sic], has similarly argued that the claimant is impaired based on the above concern, opining that the claimant has difficulty falling asleep afterwards, with residual cognitive effects from disrupted sleep.
>
> The available information related to the claimant's neurologic physical examinations, however, reveal no evidence of significant abnormalities on medical examination that would lead to concerns for significant neurologic functional impairment. The claimant demonstrates consistently unremarkable neurological examinations throughout the medical record. Although the claimant demonstrates evidence of underlying epilepsy on EEG testing, his seizures occur mostly after-hours, are brief, and reportedly nocturnal. On 7/28/2020 the claimant's seizures are described as mostly consisting of him staring for 30 seconds, and it is reported during that visit that his last seizure was 5 weeks prior. The claimant demonstrates stable neuroimaging findings of stable postsurgical changes and no evidence of brain tumor recurrence on brain MRI testing, dated 4/29/2020, that suggest disease stability throughout the medical record. No detailed cognitive testing is documented in the medical record to substantiate a claim that the claimant is cognitively impaired

> to such a degree as to preclude occupational involvement. Routine neurologic testing reveals normal gross cognition. Although travel is a material function of the claimant's occupation, the claimant reportedly is not under driving restrictions, due to the nocturnal nature of his seizures. On the basis of the above, I am in agreement with the OSP that there is insufficient evidence to assert that the claimant lacks the ability to function in a full-time occupation at the above described level of exertion.

(R. 14-2, PageID# 817).

On November 5, 2020, Plaintiff's claim for LTD benefits was denied. (R. 14-1, PageID# 842-848).

On March 9, 2021, Plaintiff was seen by Dr. Foldvary-Schaefer, and he reported going four months without any seizures—from October 2020 to January 2021. (R. 14-3, PageID# 1638).

Plaintiff submitted an appeal on December 16, 2021, along with his own affidavit, an opinion from Dr. Foldvary-Schaefer from October 28, 2021, a vocational report from Kathleen Reis, and medical records from the Cleveland Clinic spanning over twenty years. (R. 14-1, PageID# 1006). Dr. Foldvary-Schaefer's letter of October 28, 2021 reads in relevant part as follows:

> [Plaintiff] has been treated with multiple medications and two temporal lobectomy in hopes to control his seizures. However, he continues to have persistent daytime and night time seizures. These seizures are triggered by stress and lack of sleep. After a seizure, there is a recovery period for physical and cognitive recovery. This period can last 24-48 hours and can include lethargy and confusion.
>
> It is my medical opinion, that it [sic] Mr. Digeronimo would be unable to maintain any employment on a full-time basis due to being off-task at least 20% of an eight hour work day and because of issues with absenteeism of at least three to four times per month. Additionally he would be unable to maintain performance in any position that would require commercial driving or work within high-stress job duties. This would include no arbitration, confrontation, negotiation, frequent interaction with others for full-time work, and absolutely no work involving him being responsible for the health, safety, or welfare of others. These restrictions will be necessary until his seizures and secondary symptoms are controlled.

(R. 14-2, PageID# 1026).

On January 28, 2022, physician consultant Scott B. Norris, M.D., reviewed Plaintiff's file and medical records—including letters from Dr. Foldvary-Schaefer received both before and after Plaintiff's appeal—and concluded that medical evidence did not support Plaintiff having restrictions and/or limitations that would preclude the demands of his occupation. (R. 14-7, PageID# 4023-4025). He explained that "[r]ecords indicate that [Plaintiff's] pattern [of seizures] was stable compared to the pattern of seizures described by the insured well prior to the DOD [date of disability] when he was working full time. The type and intensity of treatment for the insured's seizure disorder did not change substantially leading up to the DOD, as of the DOD, or through 3/9/21. The stability of treatment for seizures during this period was not [consistent with] progressive or impairing seizures." *Id*. at PageID# 4022.

On March 2, 2022, Ms. Reis authored a letter focusing on Plaintiff's real estate investment business. (R. 14-7, PageID# 4065-4067). She indicated that Plaintiff's work in this regard is "fully accommodated … that is in no way equivalent to regular competitive employment" and "is performed on an irregular, idiosyncratic, seizure-event-based schedule." *Id*. at PageID# 4067.

On March 4, 2022, Dr. Foldvary-Schaefer wrote a brief four-sentence letter that merely expressed her disagreement with the medical reviewers' conclusions, and stated that she "stands by" her initial opinion of October 28, 2021. (R. 14-7, PageID# 4064). No explanation is contained in the letter for Dr. Foldvary-Schaefer's disagreement. *Id*.

On March 9, 2022, Defendant completed the appeal and ultimately denied Plaintiff's claim. (R. 14-7, PageID# 4071-4080).

## II. STANDARD OF REVIEW

Defendants assert there is no dispute that the Court should apply the highly deferential abuse-of-discretion (*i.e.* "arbitrary-and-capricious") standard of review to the denial of benefits in this ERISA action, because the two ERISA plans delegate to the administrator discretionary authority to determine benefit eligibility. (R. 31, PageID# 4863). Plaintiff does dispute that the arbitrary and capricious standard of review applies, nor that "[w]ith this standard of review, Plaintiff bears the burden of proof." (R. 32, PageID# 4885, *citing Farhner v. UTU DIPP*, 645 F.3d 338, 343 (6th Cir. 2011)).

"When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1065 (6th Cir. 2014) (citations omitted); *see also Autran v. P&G Health & Long-Term Disability Ben. Plan*, 27 F.4th 405, 411 (6th Cir. 2022) (courts must "uphold an administrator's benefits decision as long as it is the result of a deliberate, principled reasoning process and . . . supported by substantial evidence"). "[E]ven if the record could 'support a finding of disability,' we will affirm the administrator's decision 'if there is a reasonable explanation' for it." *Harmon v. Unum Life Ins. Co. of Am.*, No. 23-5619, 2024 U.S. App. LEXIS 6080, at *5-6 (6th Cir. Mar. 12, 2024).

> ERISA's arbitrary-and-capricious standard has both a procedural and substantive component. *See Goodwin v. Unum Life Ins. Co. of Am.*, 137 F.4th 582, 589 (6th Cir. 2025). Procedurally, we ask whether the plan administrator "engaged in reasoned decisionmaking." *Id*. (citation omitted). We've used several factors when making that inquiry, including, as relevant here, whether: "(1) the administrator considered all relevant evidence; (2) the administrator adequately explained any change from an earlier benefits ruling;" and "(3) the administrator prized the opinions of file reviewers over those who assessed the patient in-person." *Id*. None of those "factors is dispositive in its own right." *Id*. (citation omitted). Instead, we "weigh them all" to determine whether the administrator's decision was procedurally deficient. *Id*.

> (citation omitted). Substantively, we ask whether the administrator's coverage decision is "supported by substantial evidence in the administrative record." *Id*. at 592 (citation omitted). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Davis v. Hartford Life & Accident Ins. Co.*, 980 F.3d 541, 549 (6th Cir. 2020) (citation omitted).

*T.E. v. Anthem Blue Cross & Blue Shield*, 165 F.4th 971, 980 (6th Cir. 2026).

The Sixth Circuit has observed "[t]his standard is the least demanding form of judicial review of administrative action," *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003), "[y]et the deferential standard of review does not mean courts should 'rubber stamp[]' a plan administrator's decision—a court must review the quantity and quality of the medical evidence on each side." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010).

## III. ANALYSIS

### A. Responses to Treating Source's Opinions and a Vocational Opinion

Plaintiff alleges that despite providing Defendants with multiple opinions from his treating physician, Dr. Foldvary-Schaeffer, Defendants failed to properly respond. (R. 32, PageID# 4890). Plaintiff's own brief refutes this assessment, as Dr. Foldvary-Schaefer's opinion was addressed by Dr. Norris and Ms. Abbott. Plaintiff's own characterization of this review as "generic" is insufficient to find that the decision was arbitrary and capricious.

The Court agrees with Defendants that Dr. Foldvary-Schaefer's July 2020 opinion is conclusory, and merely states that Plaintiff has "seizures with confusion, altered mental state/cognition. Stress, especially at his job, is main trigger for seizure occurrences." (R. 14-1, PageID# 174). Defendants are correct that said opinion does not advise Plaintiff to discontinue working, nor does it identify with any specificity work-related restrictions that would preclude him

from performing his job. (R. 14-1, PageID# 174-76). She does not even discuss the frequency of his seizures, their duration, or their lasting effects. *Id*.

Plaintiff also points to Dr. Foldvary-Schaefer's one-paragraph October 2020 letter, which elaborates a bit more by stating that Plaintiff has nocturnal seizures that make it difficult to fall back asleep, leading to sleep deprivation, impaired cognitive function, and stress throughout the next day. (R. 14-2, PageID# 785). Again, the provider is silent on the frequency of his seizures. *Id*. As Defendants point out, this opinion was also offered at a time when Plaintiff's own statement suggests he was seizure free from October of 2020 until January of 2021. (R. 14-3, PageID# 1638). According to her own treatment notes, Dr. Foldvary-Schaefer had not seen Plaintiff in approximately nineteen months when she wrote that letter, and would not see him again until nearly five months had elapsed when she saw him during a virtual visit. *Id*.

On October 28, 2021, Dr. Foldvary-Schaefer authored another letter that offered some concrete work-related limitations, but the explanation for those limitations was no more in depth than the letter from a year earlier. (R. 14-2, PageID# 1026).

Dr. Norris acknowledged Dr. Foldvary-Schaefer's opinions in his January of 2022 analysis. (R. 14-7, PageID# 4024). He did not find the assessed restrictions supported, and explained as follows: examination findings were not consistent with the severe level of impairment reported; contemporaneous physical examinations were unremarkable without neurological deficits and mental status examinations did not identify cognitive deficits; treating source Dr. Stevens assessed a Karnofsky Performance Score of 90 in April of 2020 and March of 2021 consistent with having the ability to carry on normal activity with minor signs or symptoms of disease; diagnostic testing/imaging was consistent with a history of a complex seizure disorder, but recent brain MRIs

did not reveal any significant changes. (R. 14-7, PageID# 4024-25). This explanation more than adequately responds to Dr. Foldvary-Schaefer's opinions.

In his opposition brief, Plaintiff levies the often raised allegation of cherry-picking. "[E]videntiary 'cherry-picking' is a hallmark of arbitrary-and-capricious decisionmaking." *T. E. v. Anthem Blue Cross & Blue Shield*, 165 F.4th 971, 983 (6th Cir. 2026) (citations omitted). Plaintiff's brief essentially takes issue with Defendants ascribing greater significance or weight to some portions of the record rather than to others, but Plaintiff labeling such activity as cherry-picking does not make it so. It is easy to portray a decisionmaker's actions as cherry-picking where evidence is identified that undermines a claim of disability or where a reviewer identifies evidence that undermines a treating source's assessed restrictions/limitations. However, such assessment is not emblematic of cherry-picking but rather a hallmark of reviewing the evidence. Cherry-picking occurs where a decisionmaker focuses almost exclusively on evidence that is unfavorable to the claimant while *ignoring* evidence favorable to a finding of disability. Plaintiff has not convincingly identified material evidence that Defendants failed to consider. Relying on medical examiners who disagreed with Dr. Foldvary-Schaefer's opinions is not tantamount to cherry-picking.

Furthermore, the problem with Plaintiff's cherry-picking argument is that it cuts both ways. Plaintiff ignores evidence that undermines his claim of disability or attempts to explain away unfavorable evidence, such as the objective evidence and treatment notes that undermine his claim (*i.e.* imaging tests, Karnofsky scores, normal neurological evaluations, paucity of cognitive deficits in treatments notes). (R. 34, PageID# 4919). Plaintiff's claim of cherry-picking is unpersuasive. Therefore, this Court finds that Defendants did not act arbitrarily or capriciously when reviewing the evidence within the record.

Plaintiff's argument that Dr. Norris did not respond to a letter from Dr. Foldvary-Schaefer dated March 4, 2022 is unconvincing. As the Court has already noted above, the letter is of no real import. Dr. Foldvary-Schaefer merely stated that she disagreed with the medical reviewers' conclusions and "stands by" her October 28, 2021 opinion. (R. 14-7, PageID# 4064). Moreover, the letter contains no explanation as to the basis of her disagreement with the medical reviewers. *Id*. Defendants acknowledge as much in their decision letter. ("On March 4, 2022 we received your email with a March 4, 2022 letter from Dr. Foldvary-Schaefer reconfirming her medical opinion and expressing disagreement with our physician's conclusions. *** While you provided a new letter from Dr. Foldvary-Schaefer, the information contained within the letter is not considered new information that would change our prior medical opinion on appeal.") (R. 14-7, PageID# 4076). The letter was not ignored. Simply put, there was nothing in this final letter that required a response, as it merely referenced the prior position.

This case is readily distinguishable from the facts of *Glenn v. MetLife*, 461 F.3d 660, 671-72 (6th Cir. 2006), *aff'd sub nom. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), that is cited by Plaintiff. (R. 32, PageID# 4895). Therein, MetLife offered "no explanation for its resolution of the conflict," which cannot be said about this case, and in MetLife there was no indication that the physician's opinion had been given any consideration at all, an argument that cannot be made in good faith herein.

Plaintiff also argues that Ms. Reis, a vocational expert, provided two vocational reviews and opinions: (1) a review of Dr. Foldvary-Schaefer's opinion, which concluded that Plaintiff could not perform his own or any other occupation, nor any occupation; and (2) a rebuttal opinion of Ms. Reis to the vocational opinion of reviewer Mr. O'Kelley. (R. 32, PageID# 4896). Plaintiff asserts that

"Defendants did not provide any other vocational review or counter to Ms. Reis' conclusion before issuing the final decision on 3/9/22." *Id*.

Plaintiff's own brief "recognizes that part of Ms. Reis' opinion" hinges on the Court's finding issue with Defendants' handling of Dr. Foldvary-Schaefer's opinion. (R. 32, PageID# 4896). As the Court finds no procedural defect in the Defendants' handling of said opinion, this line of argument is moot in its entirety, as Reis's opinion is predicated on the limitations assessed by Dr. Foldvary-Schaefer being fully credited. Furthermore, Defendants did not ignore Reis's second letter. The record show Defendants responded to Plaintiff's counsel, "You also attached a March 02, 2022 letter from Ms. Reis further commenting that it was their opinion that presently your client 'has fully accommodated work like activity that is in no equivalent to regular competitive employment, even part time.' While we appreciate the additional analysis provided by Ms. Reis, your client must be considered medically precluded from performing their occupation." (R. 14-7, PageID# 4076). Plaintiff also relies on a decision wherein "the defendant's vocational analysis ignores unrefuted evidence." (R. 32, PageID# 4897, *citing Evans v. UnumProvident Corp.*, 434 F.3d 866, 880-81 (6th Cir. 2006)). Plaintiff has not identified any "unrefuted evidence" that renders this case akin to *Evans*. Finally, Defendants had a reasonable basis for discounting Reis's opinion that Plaintiff's side business was "minimal activity, which was essentially managing his financial investment, [and] did not come close to" constituting employment or financial gain. (R. 32, PageID# 4897, *citing* R. 14-7, PageID# 4065-4067). Defendants relied on Plaintiff's own testimony that he was self-employed even after claiming disability and has a house flipping company and a construction company (R. 14-2, PageID# 763), and he takes an annual management salary of

$42,000 from the house-flipping company he manages (R. 14-2, PageID# 1016; R. 14-3, PageID# 1563).

**B. Structural Conflict**

Plaintiff asserts that because Defendant Unum is both the administrator and payor of benefits under the Plans, there is a structural conflict of interest. (R. 32, PageID# 4897-98). The Supreme Court has recognized that such a scenario creates a conflict for ERISA purposes, but such a conflict should merely be weighed as a factor in determining whether there has been an abuse of discretion, and does not alter the deferential standard of review. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 114-15 (2008).

The Sixth Circuit has cautioned, however, that "we have … emphasized that 'conclusory allegations of bias' based on this (relatively common) inherent conflict do not deserve much weight" and that a plaintiff must "uncover evidence suggesting that the conflict materialized in a concrete way to influence the administrator's decisional process." *Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 418 (6th Cir. 2022); *see also Holden v. Unum Life Ins. Co. of Am.*, No. 20-6318, 2021 U.S. App. LEXIS 20441, at *59 n. 21 (6th Cir. July 8, 2021) ("Sixth Circuit caselaw requires a plaintiff not only show the purported existence of a conflict of interest, but also to provide 'significant evidence' that the conflict actually affected or motivated the decision at issue.") (citations omitted); *accord Smith v. Unum Life Ins. Co. of Am.*, 2026 U.S. Dist. LEXIS 148539, at *23 (E.D. Tenn. July 6, 2026) (the evidence of the influence of conflict of interest must be significant and show that the conflict *actually affected or motivated the decision*) (emphasis added).

Plaintiff points to the following "factors" as evidence of the conflict materializing: (1) Defendants' weighing of the medical evidence and the opinions of record; and (2) Defendants relying exclusively on file reviews by allegedly biased reviewers rather than requesting a physical examination.

Plaintiff's first factor—which he believes is evidence of a conflict—consists largely of reiterating his dissatisfaction with Defendants' reliance on the medical reviewers, Dr. Norris and Ms. Abbott, and Defendants' decision not to fully credit the restrictions assessed by Dr. Foldvary-Schaefer. (R. 32, PageID# 4898-4901). Plaintiff also offers an alternative interpretation of the facts and medical history, as opposed to the reviewers—which seemingly invites a *de novo* review. *Id*. In any event, these arguments do not constitute evidence suggesting that a conflict of interest actually materialized and motivated Defendants' decision.

Plaintiff also takes issue with Defendants' reliance solely on file reviews by a non-examining nurse and non-examining physician rather than calling for a physical examination. (R. 32, PageID# 4901). Plaintiff alleges that Dr. Norris has "an extremely lengthy history in providing sub-par reviews." *Id*. at PageID# 4902. Plaintiff relies on cases in which other courts criticized reviews conducted by Dr. Norris involving different insureds and different records. *Id*. at n. 4. This argument essentially rehashes Plaintiff's argument when he sought discovery. (R. 24, PageID# 4693-94). But the Court already rejected this line argument:

> Although Plaintiff raises questions regarding the quality of Dr. Norris' opinions in other cases as grounds for alleging bias and procedural irregularity, the argument is not persuasive. Rather, the aforementioned rationale for precluding discovery into other claims history holds here, because opening discovery as Plaintiff requests—into a five year period of other claims consideration—would not show "bias or a conflict of interest [as the claimant] would [still] have to show that each of those decisions was unreasonable based on the evidence in each file. Doing so would require a mini-trial on each of these other appeals." *Reichard*, 805 Fed. App'x at

> 116–17; *accord Hughes*, 507 F. Supp. 3d at 399 ("bare numbers or percentages of claim denials are meaningless without additional context – and that context cannot be provided without holding minitrials on the other claims.").

(R. 27, PageID# 4818).

None of the other cases cited by Plaintiff constitute evidence that suggests a conflict of interest materialized in *this* case. Rather, it is merely a conclusory allegation, an insinuation that any review of Dr. Norris's is inherently suspect. Plaintiff opines his review was "poor." (R. 32, PageID# 4903). Having reviewed Dr. Norris's review of the record, the Court found nothing deficient or suspect in its analysis or conclusions. It clearly articulates the evidence, including objective medical tests and treatment records from the relevant time frame, and why the assessed restrictions were not credited.

Plaintiff concedes that the Sixth Circuit has made clear that plan administrators are not always required to conduct in-person exams, but failure to do so when the plan expressly reserves that right can undermine the credibility of a denial. (R. 32, PageID# 4903, collecting cases). Nevertheless, the Sixth Circuit has observed that "we find nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005).[4] Recently, the Sixth Circuit Court of Appeals has explained as follows:

---

[4] Although the *Calvert* decision ultimately concluded that the file review therein was "clearly inadequate," it did so because it was unclear whether the reviewer actually reviewed the entire file. He did "not describe the data he reviewed in reaching his conclusion" he made "no mention of the surgical reports, x-rays or CT scans in the record," and was unaware that claimant's initial surgery was prompted by an injury resulting in objectively calculable harm to her spine. *Calvert*, 409 F.3d at 296. Dr. Norris expressly discussed the timing and frequency of Plaintiff's seizures, the treatment and medications he received, his remote history of seizure onset over twenty years earlier, prior surgery, epilepsy evaluations from fourteen years earlier, Plaintiff's reported symptoms, recent

> At any rate, we "may not conclude that the opinion of treating physicians is entitled to more weight than that of non-treating physicians." *Bruton v. Am. United Life Ins. Corp.*, 798 F. App'x 894, 904 (6th Cir. 2020). "Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another . . . the plan administrator's decision cannot be said to have been arbitrary and capricious." *McDonald v. W.S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003); *cf. Smith v. Reliance Standard Life Ins. Co.*, 778 F. App'x 207, 211 (4th Cir. 2019) (applying abuse of discretion framework and noting how plan administrators need not give treating physicians' opinions controlling weight). Nor does such a choice increase the administrator's burden of explanation for its decision.

*Goodwin v. Unum Life Ins. Co. of Am.*, 137 F.4th 582, 591 (6th Cir. 2025)

Plaintiff's own brief acknowledges that his "impairments, such as memory lapses, confusion, and aura episodes are inherently episodic and often reliant on self-reports and lay observation (e.g., spousal accounts, which are documented in the record and referenced in the affidavit and internal correspondence)." (R. 32, PageID# 4904). Under such circumstances, it is unclear what an in-person medical examination would have revealed that was not already part of the record. As noted previously, Plaintiff already had two brain MRIs close in time to his alleged onset of disability. As such, the file reviewers were not relying on stale evidence. Notably, the opinions of Dr. Foldvary-Schaefer, upon which Plaintiff wanted Defendants to rely, were given despite not having personally examined Plaintiff for a significant amount of time. Furthermore, as pointed out in Defendant's reply, Plaintiff was seen by his long-time treating neuro-oncologist Dr. Stevens in person on March 22, 2021—after Plaintiff had already alleged he was disabled. (R. 14-3, PageID# 1617). Dr. Stevens opined that Plaintiff was "doing well" neurologically and concluded he had

---

diagnostic testing and MRIs of Plaintiff's brain. (R. 14-7, PageID# 4022-26). Thus, the two decisions are clearly distinguishable.

good recent and remote memory, good comprehension, a stable brain MRI, and his attention span and concentration remained intact. *Id*. at PageID# 1619-20.

Although the Court recognizes that there may be cases where the decision to forego an in-person medical evaluation could lead to an arbitrary and capricious decision or constitute evidence of a conflict materializing, this is not such a case. When a plan administrator relies upon the medical opinion of one doctor over that of another, such decisions are generally not construed as arbitrary and capricious. Here, only one of Plaintiff's treating physicians assessed work-related restrictions that, if credited, could have resulted in disability. No such opinion was offered by Dr. Stevens. Finally, a reviewing neurologist also reviewed the file in addition to Dr. Norris and Ms. Abbott. Under these circumstances coupled with the nature of Plaintiff's claimed symptoms that are not readily confirmable by a physical examination, the Court finds the decision not to seek a medical examination as insufficient evidence that the decision was arbitrary or capricious.

**C. Curriculum Vitae and Appropriate Training**

Plaintiff takes the position that because Defendants relied on the medical opinions Ms. Abbott, Dr. Norris, and vocational expert Kelly, who based their conclusions on their "training and experience," Defendants violated ERISA regulations by not providing these reviewers' curriculum vitae ("CVs"). (R. 32, PageID# 4888-89). Plaintiff also contends that because 29 C.F.R. § 560.503-1(h)(iii) states that Defendants "shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment," said individuals' CVs must be turned over.

The Court already rejected this line of argument when it denied Plaintiff's request for discovery.

> Plaintiff asserts that his counsel requested the resumes and/or CVs of Defendants' medical and vocational reviewers, but this request was denied. (R. 24, PageID# 4697, citing R. 14-7, PageID# 4033). Indeed, the record reflects that Defendant took the position that "[a]lthough we acknowledge your rationale to have the CV and/or length of employment with Unum, we are not obligated to honor this request during the appeal review." (R. 14-7, PageID# 4035). In another letter, Defendant Unum indicated that "[i]f you disagree and have specific legal authority that you believe requires us to produce CVs and other employment information you are welcome to send it. Upon receipt of that information, we will further review and respond." (R. 14-7, PageID# 4045). There is no indication that Plaintiff ever furnished any legal authority to Defendant during the appeal process. Plaintiff similarly fails to identify any legal authority in his brief standing for the proposition that such information must be turned over during an appeal. (R. 24, PageID# 4698). Rather, Plaintiff relies on his own interpretation of federal regulations.

(R. 27, Page ID# 4821–22). The Court was unpersuaded that a medical or vocational expert's CV or resume constitutes a document that was relied upon, submitted, considered or generated in making a benefit determination within the meaning of 29 C.F.R. § 2560.503-1(m)(8)(i)-(ii). *Id*. Plaintiff cites no authority supporting his interpretation. Despite the Court's prior decision, Plaintiff has resurrected this argument, but again relies upon no legal authority to support his own unconvincing interpretation of the regulations. Consequently, the argument is unpersuasive.

Plaintiff's second argument contends that the regulations require medical reviewers to have the appropriate medical training and experience to give a medical opinion, noting that Plaintiff suffered from ongoing seizures. (R. 32, PageID# 4889-90). He contends that there is no documentation showing that the medical reviewers had the proper training or experience in neurology to review and respond to Plaintiff's seizure disorder, observing that "Dr. Norris' Family, Occupational, Aerospace and Internal Medicine specialties are not equivalent or a replacement for a proper review by a Neurologist." *Id*.

"While ERISA does not demand an examination by the narrowest of specialists, we have noted its requirement that administrators retain health care professionals in the specific field of

medicine at issue." *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610 (6th Cir. 2016). Nevertheless, "requiring Defendants to rely exclusively on physicians with narrow expertise would be in tension with regulations and binding caselaw that admonish us not to demand that Defendants locate 'the narrowest of specialists.'" *Lloyd v. P&G Disability Ben. Plan*, No. 20-4329, 2021 U.S. App. LEXIS 26748, at *31 (6th Cir. Sep. 3, 2021); *accord Grace v. Unum Life Ins. Co. of Am.*, No. 1:24-cv-131, 2025 U.S. Dist. LEXIS 281586, at *15 (E.D. Tenn. Aug. 25, 2025) ("Whether a medical professional has appropriate training and experience depends on the facts of the case."); *see also Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007); *Iley v. Metro. Life Ins. Co*., 261 Fed. App'x 860, 864 (6th Cir. 2008) ("an ERISA plan is not required to hire specialists for every claimed malady").

The Court agrees that Dr. Antaki (board-certified in Internal Medicine), Ms. Abbot (a Registered Nurse), and Dr. Norris (board-certified in Family and Occupational Medicine), have sufficient experience and training. (R. 14-2, PageID# 805; R. 14-7, PageID# 3999, 4007). Moreover, Dr. Chilungu, board-certified in Neurology, also reviewed Plaintiff's record and concluded, like the other physicians and consultants, that the record did not support functional restrictions that would qualify for disability. (R. 14-2, PageID# 816-817).

Therefore, Plaintiff's argument is not well taken.

**IV. Conclusion**

For the foregoing reasons, Defendants' Motion for Judgment on the Administrative Record (R. 31) is GRANTED, and Plaintiff's Motion for Judgment on the Administrative Record (R. 32) is DENIED.

IT IS SO ORDERED.

*s/ David A. Ruiz*
DAVID A. RUIZ
UNITED STATES DISTRICT JUDGE

Date: September 14, 2026